**Dorothy VISCONTI, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

**No. 91 Civ. 2552 (MBM).**

United States District Court, S.D. New York.

Aug. 25, 1992.

Philip J. Dinhofer, Sable, Gold & Dinhofer, New York City, for plaintiff.

Ralph G. Wellington, Michelle Schiffer, Michael G. Tierce, Schnader, Harrison, Segal & Lewis, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, Dorothy Visconti, sues her employer, Consolidated Rail Corporation ("Conrail"), under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 ("FELA"), for both intentional and negligent infliction of emotional distress. Defendant moves for summary judgment. For the reasons set forth below, defendant's motion is granted, with leave for plaintiff to amend her complaint to allege sexual harassment should the facts justify such an allegation.

### I.

Summary judgment is appropriate if the evidence demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). Accordingly, the parties agree that for the purposes of this motion the Court should accept the version of the facts set forth in plaintiff's deposition testimony.[1]

Plaintiff has been employed by Conrail and a predecessor corporation, the Central Railroad of New Jersey, since October 23, 1974. (Visconti Dep. at 4)[2] On April 15, 1991, plaintiff filed this suit alleging that she has suffered extreme emotional distress as a result of "continuous, unrelenting and vicious forms of harassment, verbal, visual, abuse and emotional harassment" by Conrail management. (Compl. ¶¶ 6, 7)

The harassment allegedly began in June 1989, shortly after plaintiff injured her an-

kle at Conrail's South Kearney New Jersey Terminal. (Dep. at 44–45) According to plaintiff, "she was harassed by all the manage[rs]" at the South Kearney facility, initially because the injury tarnished the facility safety record. (Dep. at 45) Later, she was "harassed for harassment['s] sake." (Dep. at 290) In her testimony, plaintiff described a series of 54 "incidents of harassment."

*Incident 1:* Plaintiff maintains that on the night of the injury she was "harassed" by Fran Palumbo, a Conrail supervisor, who was forced to forego a social engagement to help plaintiff complete various accident reports. (Dep. at 85) According to plaintiff, Palumbo did not know how to file the necessary reports and, as a result of her frustration, Palumbo "turned everything around," and reported plaintiff for insubordination and failure to cooperate. (*Id.*) Plaintiff filed a grievance with her union, the Brotherhood of Railway and Steamship Clerks ("union"), and was exonerated after a hearing. (Dep. at 57, 86)

*Incident 2:* A week after the injury Kenneth Weber, a Conrail claims investigator, visited plaintiff's home to obtain a statement. According to plaintiff, Weber walked around and examined her property before knocking on the front door. (Dep. at 53–55)

Once inside, Weber, who "was very forceful," took out a tape recorder and plaintiff's employment records and began questioning plaintiff about the accident. (*Id.*) Plaintiff informed Weber that she wasn't feeling well and after speaking to her attorney asked him to leave. (*Id.*)

*Incident 3:* In September 1989, plaintiff returned to work as a gate clerk. One day shortly after her return, William Gallagher, her supervisor, left work early leaving plaintiff in charge of the gate operation. Later on that day there was an oil spill and plaintiff called Gallagher for help. Gallagher, however, was "belligerent" and re-

---

1. For the purposes of this motion, plaintiff accepts as accurate the summary of her testimony included in defendant's memorandum of law. (Pltf. Mem. at 1)

2. Hereinafter, citations to plaintiff's deposition testimony will appear as follows: (Dep. at ___).

fused to return to the terminal. Plaintiff threatened to report Gallagher to his supervisor and Gallagher replied that she would "'pay for this.'" (Dep. at 58–59)

The next day plaintiff received three notices of investigation charging her with violations of various work rules. (*Id.*) One charge was dropped because of insufficient evidence. The other two were resolved through the grievance procedure established by the collective bargaining agreement. (Dep. at 60–61)

*Incident 4:* In November 1989, Paul Birnbaum, another supervisor, called a junior clerk to work a shift that plaintiff, a senior employee, was entitled to work. Plaintiff filed a claim with the union that ultimately was resolved in her favor. (Dep. at 192)

*Incident 5:* In February 1990, pursuant to a procedure set forth in the collective bargaining agreement, plaintiff "bid" into a clerk stenographer position displacing Betty Staples, the employee who held the job. Plaintiff claims that she then was harassed by Conrail managers who "liked and favored" Staples. (Dep. at 61)

Shortly after plaintiff displaced Staples, Wayne Wagner, one of plaintiff's supervisors, "ran" out to her car as she was leaving for lunch and asked whether she had copied and removed any company payroll records. Plaintiff denied doing so; nevertheless, she later received a notice of investigation for tampering with confidential company records. (Dep. at 62–63)

Following a hearing at which she was represented by the union, an administrative officer determined that plaintiff had reproduced and removed confidential company records without authorization and disqualified plaintiff from holding the position of clerk stenographer. (Dep. at 69, 70, 82–83) The hearing officer's determination was affirmed on appeal. (Dep. at 70)

*Incident 6:* Plaintiff claims that in February or March 1990 Palumbo ordered plaintiff to leave the terminal because her shoes did not conform to company safety standards. The reader will recall that plaintiff already injured her ankle once, the event she claims loosed a torrent of harass-

ment. (*See* p. 2, *supra*) In response, plaintiff informed a union representative who in turn called another of plaintiff's supervisors. The supervisor agreed to allow plaintiff to remain at work on condition that in the future she wear appropriate footwear. (Dep. at 74–76, 78–79)

*Incident 7:* According to plaintiff, Palumbo allowed other clerks, including Betty Staples, to leave work early with pay for medical purposes but required that plaintiff take a personal day to visit her physician. When plaintiff brought this to Palumbo's attention two clerks previously paid were docked for time spent at the doctor. Plaintiff complains that this unfairly "put [her] in the spot of the bad guy." (Dep. at 78–79)

*Incident 8:* According to plaintiff, Palumbo also harassed her by: having her revise letters "up to eight times, not for errors in typing but because [Palumbo] rearranged the wording"; making fun of plaintiff's clothes; "whispering" about plaintiff with other clerks; excluding plaintiff from conversations; and displaying an "unpleasant[ ] attitude" toward plaintiff. (Dep. at 77–78, 81)

Regarding work assignments, plaintiff claimed Palumbo would assign other clerks the "more important typing of letters and other things while she had [plaintiff] do the lesser things such as filing or typing out envelopes or making a hundred copies of a particular item." (Dep. at 81)

*Incident 9:* According to plaintiff, on one occasion Palumbo asked a junior employee to work a shift that plaintiff was entitled to work. Plaintiff's claim for three hours pay is pending. (Dep. at 86)

*Incident 10:* While plaintiff was working as a clerk stenographer, Gallagher asked her to type various documents including letters denying three of her claims. According to plaintiff, Gallagher "laughed" as he dictated the letters.

Plaintiff also maintains that Gallagher repeatedly accused her of improperly typing a document that another employee had typed. (Dep. at 90–94)

*Incident 11:* Plaintiff claims that she was "harassed" by Gallagher's "sexual innuendos". (Dep. at 94) Plaintiff maintains that Gallagher "was always talking about body parts and making dirty jokes and laughing about same." Although "he was doing it in a lighthearted manner," his language nevertheless "offended" plaintiff. (Dep. at 94–95)

*Incident 12:* One night while plaintiff was working the gate, Gil Mayer, a supervisor, brought her another employee's jacket because the heater in the gatehouse had malfunctioned. On completing her shift, plaintiff left the jacket in the gatehouse. Plaintiff contends that three months later Mayer wrongly accused her of stealing the jacket in the presence of other Conrail employees. (Dep. at 98–99)

*Incident 13:* According to plaintiff, Birnbaum persistently harassed and "pick[ed] on" female employees. Plaintiff described Birnbaum's conduct as follows: "He used to raise his voice and try to use intimidating tactics. He told dirty jokes. He had foul language and it was disparity of treatment. He treated the men better than he did the women." (Dep. at 100–101)

*Incident 14:* Plaintiff complains that Birnbaum frequently called her during her shifts at the South Kearney Terminal. According to plaintiff, Birnbaum would "pump her for information" about business at South Kearney and then discuss what he learned with other Conrail supervisors. (Dep. at 101–105)

*Incident 15:* In March 1990, after she was disqualified from her position as a clerk stenographer, plaintiff took several weeks sick leave in order to "recuperate." Upon her return to active status, she attempted to obtain several jobs by "bumping" junior employees pursuant to the collective bargaining agreement. Plaintiff maintains that management prevented her from obtaining a suitable position. (Dep. at 112)

*Incident 16:* In April 1990, plaintiff attempted to return to work at the South Kearney facility by bumping stenographer Lisa McGregor. When plaintiff arrived, Dan Borelli, a supervisor, informed her that she could not replace McGregor and demanded that she leave the terminal. When plaintiff refused, Borelli called the Conrail police who escorted her off Conrail property. (Dep. at 113–115)

Plaintiff's grievance was denied because of her earlier disqualification for copying and removing confidential records. The union has appealed on plaintiff's behalf. (Dep. at 115–116)

*Incident 17:* Following her unsuccessful attempt to return to South Kearney, plaintiff could obtain only "an inferior" janitorial position at Conrail's Oak Island, Newark facility. While working at Oak Island plaintiff filed a grievance against her supervisor, Jeff Harris, because on the day she was displaced by a senior employee, Harris sent her home in the middle of a shift. Plaintiff's claim is pending. (Dep. at 116–121)

*Incident 18:* During plaintiff's employment at Oak Island, a male yard worker filled in for a stenographer who had taken two weeks leave. Believing she was entitled to the position, plaintiff filed a grievance. (Dep. at 121–123)

*Incident 19:* Plaintiff returned to the South Kearney facility in September 1990. On September 19, 1990, a junior employee was called to work a shift plaintiff believed she was entitled to work. Plaintiff's grievance is pending. (Dep. at 127–128)

*Incident 20:* Plaintiff's appeal of her suspension for removing confidential documents was denied on November 5, 1990. Upon receiving the notice, Borelli directed another Conrail employee to inform plaintiff that she must immediately begin serving the suspension. The employee called plaintiff at 4:30 a.m. to tell her not to show up for the 6:30 a.m. shift. (Dep. at 128–130)

Plaintiff nevertheless reported for work but left after Borelli "shouted" at her and provided her with formal notice of the suspension. Plaintiff claims that as she was leaving Borelli and other supervisors laughed at her and humiliated her in front of her co-workers. (Dep. at 130–132)

Plaintiff reported the incident to the union. The following week she was reinstated because the notice of suspension was deficient. (Dep. at 133)

*Incident 21:* On November 5, 1990, the same day Borelli enforced plaintiff's suspension, plaintiff wrote to Carol Evans, Conrail's Equal Employment Opportunity Officer, accusing Borelli of sexual harassment. (Not. of Mot.Exh. C) Plaintiff claims that sometime during the summer of 1990, Borelli "brush[ed] close" to her body, stood close to her for one or two minutes and put his hand on her back for less than a minute. (Dep. at 18–24) In her letter to Evans plaintiff wrote:

> Mr. Borelli does not conduct himself as a Manager of the Company should. He dates the clerks of this Company and is presently living with one. He has made many sexual advances to me in person and by phone. He parks behind my car to block me from getting out, so that I have to get him to move it. Because I have rebuffed all his advances he continues to make my life miserable.

In her deposition testimony, plaintiff accused Borelli of making "hang-up calls" to her home and reiterated her complaint that Borelli occasionally parked his car near hers in the parking lot. (Dep. at 26) Plaintiff conceded, however, that supervisors often call employees at home and when Borelli identified himself the conversations concerned only work-related matters. (Dep. at 34–35) Regarding the "many sexual advances ... [made] in person," plaintiff was vague in her testimony and cited only the use of "suggestive language." (Dep. at 29) When pressed for details, plaintiff admitted that many Conrail supervisors used similar language, but Borelli used it in "a different context ... one that suggested sexual overtones." (Dep. at 33) Plaintiff, however, was unable to articulate any specific ways in which Borelli's use of such language differed from that of other supervisors. (Dep. at 33–34) Finally, plaintiff acknowledged that there is a parking problem at the South Kearney terminal and employees typically have to double and triple park. (Dep. at 65)

Plaintiff also accused Birnbaum of making "hang-up and dirty phone calls" to her home. When confronted with the fact that earlier she had accused Borelli of similar behavior, plaintiff explained, cryptically, that "Borelli is a personal friend of Mr. Birnbaum." When asked who she thought was responsible for the phone calls, plaintiff answered: "I don't know. Some of the hang-up calls could have been either of them." (Dep. at 107) As with Borelli, plaintiff admitted that when Birnbaum identified himself, the conversations concerned only work-related matters. (Dep. at 108)

*Incident 22:* Plaintiff contends that although she was available for work on December 10, 1990, four junior employees were called instead. Her grievance is pending. (Dep. at 135, 140)

*Incident 23:* In December 1990, plaintiff's second attempt to displace Lisa McGregor was denied. (Dep. at 125) Plaintiff's grievance is pending.

*Incident 24:* At the close of 1990, Mayer suggested that plaintiff, then employed as a train programmer, look for another position because of her lack of programming experience. Plaintiff interpreted this as a threat that she would be "tormented again." As a result, plaintiff left her programming job for another position. (Dep. at 201–202)

*Incident 25:* On February 1, 1991, plaintiff had car trouble on the way to work. She called to inform her supervisor and was told to call back later. When she called back to tell her supervisor that the car was still disabled, she was told that her position had been filled for the day. Plaintiff did not file a grievance. (Dep. at 142–146)

*Incident 26:* On February 4, 1991, plaintiff was assigned to work the outside gate while a junior employee was assigned to do computer work. Plaintiff did not file a grievance. (Dep. at 147–148)

*Incident 27:* On February 5, 1991, plaintiff was asked by Palumbo to fill in at several different positions. Plaintiff complained to her union representative. The

next day she was asked to perform only one type of task. (Dep. at 148–150)

*Incident 28:* On February 6, 1991, plaintiff and several other employees attended a hazardous materials class. The teacher informed the class that those in attendance would be paid for four hours. When plaintiff filled out her time sheet, Palumbo angrily told her she would be paid for three hours, the actual time spent in class. Because incidents were occurring almost daily, plaintiff did not file a grievance; she did not want "to appear to be a pain." (Dep. at 151–152)

*Incident 29:* On March 1, 1991, a junior employee worked an overtime shift which was not offered to plaintiff. Plaintiff filed a grievance which was denied because, according to management, plaintiff was not qualified to work with hazardous materials. Plaintiff has appealed. (Dep. at 152–153)

*Incident 30:* On March 12, 1991, plaintiff was notified by Conrail's labor relations department that she would be paid for two of her claims. Payment, however, was delayed. Although plaintiff concedes that she does not know who withheld the checks or even if it was done intentionally, she believes that Palumbo and Staples are responsible. Plaintiff complained to another supervisor and received the checks shortly thereafter. (Dep. at 155–157)

*Incident 31:* On May 9, 1991, plaintiff bid for yet another stenographer position. She was denied the position and filed a grievance. (Dep. at 161–163)

*Incident 32:* On May 15, 1991, two junior clerks were called to work but plaintiff was not. Plaintiff's grievance was denied. (Dep. at 159, 212–213)

*Incident 33:* On May 22, 1991, plaintiff called in sick. She contends, however, that later that week she tried to call back to return to active duty but could not reach her supervisor. Plaintiff eventually reached a Conrail police officer who promised to notify Wagner that plaintiff was available for work.

Plaintiff next was called to work on May 28, the day after the Memorial Day holiday. Plaintiff filed a grievance for holiday pay because she was available to work the day before the holiday and worked the day after. The grievance was denied. (Dep. at 208–210)

*Incident 34:* On June 5, 1991, supervisor Harry Ricks sent plaintiff home claiming her shoes did not conform to safety standards. Plaintiff filed a grievance. (Dep. at 166–168)

*Incident 35:* On June 6, 1991, a junior employee worked eight hours of overtime despite the fact that plaintiff, a senior employee, had not worked 40 hours that week. Plaintiff notified the union, but does not recall if she filed a grievance. (Dep. at 204–206)

*Incident 36:* On June 7, 1991, plaintiff filed a grievance because she again was denied Staples's stenographer position. This claim is pending. (Dep. at 206)

*Incident 37:* On July 2, 1991, plaintiff again attempted to displace Staples. A supervisor informed her that her request was denied because of her earlier disqualification for copying and removing confidential records. Plaintiff's claim is pending. (Dep. at 211)

*Incident 38:* On July 10, 1991, a junior employee worked a shift that was not offered to plaintiff. Plaintiff informed the union but did not file a grievance. (Dep. at 205–206)

*Incident 39:* On August 21, 1991, plaintiff, who at that time held a clerical position at South Kearney, was displaced by another employee. In turn, plaintiff again tried to displace Staples. A supervisor denied plaintiff the position citing her earlier disqualification. Plaintiff claims that Wagner laughed and said: " '[Y]ou have got to be kidding, do we have to go through this all over again? Why do you even bother trying to bump this job?' " (Dep. at 213–214)

*Incident 40:* On August 26, 1991, plaintiff received what is called an Appendix II letter, a letter used to admonish an employee for excessive absence. Plaintiff wrote to a supervisor claiming the letter was unwarranted. After reviewing the situation, the supervisor rescinded the Appendix

II letter on procedural grounds and issued a less serious Appendix I letter. Plaintiff contests the propriety of the Appendix I letter and "is in the process of writing to the union regarding that problem." (Dep. at 217–219)

*Incident 41:* Plaintiff claims that during "her vacation week" Wagner sent her several certified letters regarding claims she had filed against Conrail. On September 1, 1991, plaintiff wrote to Wagner to complain about this "harassment." (Dep. at 220–221)

*Incident 42:* In the fall of 1991, plaintiff wrote to Weber, the Conrail representative that visited her home in 1989, to apply for a job in Conrail's claims department. Plaintiff met with Weber in October 1991, but maintains, without offering any details, that she was "harassed throughout the entire interview." Plaintiff was not offered the job and filed a grievance. (Dep. at 240)

*Incident 43:* On October 31, 1991, junior stenographer McGregor received a clerk stenographer position for which plaintiff also had applied. On November 2, 1991, plaintiff wrote to Wagner to complain about not being offered the position. (Dep. at 241–243)

*Incident 44:* On December 1, 1991, Wagner asked plaintiff to work on her "rest day." When plaintiff refused claiming she had car trouble, Wagner was "very belligerent." Plaintiff did not file a grievance. (Dep. at 277)

*Incident 45:* On December 21, 1991, plaintiff failed to show up for her scheduled 7 a.m. shift because her alarm was not working properly. Wagner called her at 7:15 a.m. and, finding her at home, told her not to come in. Plaintiff did not file a grievance. (Dep. at 277)

Plaintiff claims that as a result of her absences on December 1 and December 21, Wagner tried to bring her up on charges of excessive absenteeism. This upset plaintiff who "fully wanted to come in" on those days. (Dep. at 278)

*Incident 46:* On January 27, 1992, supervisors Wagner and Gosinsky "raided" the gatehouse where plaintiff was working and demanded that she sign a notice of investigation regarding charges of lateness. Plaintiff refused to sign the document. As a result of this incident plaintiff became physically ill and left work. (Dep. at 279–282) .

*Incident 47:* Plaintiff claims that Wagner often challenged her time card. One day in early February 1992, Wagner insisted that plaintiff correct her card so that it reflect the actual time she arrived at work. At Wagner's insistence, plaintiff changed her sign-in time to 2:07 p.m. from 2:05 p.m. (Dep. at 284–286)

*Incident 48:* On February 17, 1992, President's Day, a junior clerk was asked to work; plaintiff was not. (Dep. at 284)

*Incident 49:* On February 19, 1992, Mayer came out to the gatehouse where plaintiff was working to check if she was wearing the proper kind of shoes. He watched her work for awhile, which upset plaintiff, and then instructed her to leave the gatehouse and work another position. When plaintiff asked to go to lunch, Mayer refused and insisted she take her lunch break later. (Dep. at 282–283)

*Incident 50:* On February 20, 1992, plaintiff noticed that although fellow employee Dorothy Brown left work early, Wagner approved her time sheet which indicated Brown had worked a full eight hour shift. Plaintiff claims that this constitutes harassment because the managers are "very, very particular about ... [plaintiff's] time." Plaintiff concedes that she does not know the circumstances surrounding Brown's early departure, nor does she know whether Brown was paid for the time. (Dep. at 287–288)

*Incident 51:* According to plaintiff, F.J. Doyle, a member of Conrail's Labor Relations Department, sent her a letter stating that one of her claims would be denied because, contrary to plaintiff's calculations, she was not entitled to overtime. Plaintiff claims also that Doyle took "a very harsh position" regarding plaintiff's numerous attempts to obtain a stenographer position. (Dep. at 225–226)

*Incident 52:* Because of a lack of parking facilities at South Kearney, plaintiff often would have to circle the lot two or three times to find a spot and, as a result, would arrive a few minutes late. Supervisor John Marro often upset plaintiff by insisting that she sign in at the time she actually entered the building instead of the time she drove into the parking lot. Plaintiff also claims that she experienced "stress and anxiety" when Marro informed her that she would have to work on a weekend and might have to perform certain managerial tasks because she would be the only clerk at the terminal. (Dep. at 234–236)

*Incident 53:* Sometime in 1989, the exact date is unclear, supervisor C.A. Savoye selected a junior employee, instead of plaintiff, to work a shift as a stenographer. Plaintiff filed a grievance and was compensated. (Dep. at 238–239)

*Incident 54:* Plaintiff claims that fellow employees Staples, Matthias, and Werb falsely testified against her at a grievance hearing. (Dep. at 267)

Plaintiff maintains that as a result of these 54 incidents she has experienced chest and stomach pains, headaches, nausea, anxiety and depression. (Dep. at 15, 291, 294) She has frequently sought the advice of her family physician and a psychiatrist who have prescribed various medications including one for stress and depression.[3] (Dep. at 291–300) Plaintiff has not been hospitalized for these symptoms, but since the ankle injury she has been unavailable for work on 127 days. (Dep. at 308, 310–311)

## II.

FELA, enacted in 1906, provides a cause of action in tort for railroad workers injured on the job. *See* 45 U.S.C. §§ 51–60. Section 51 of Title 45 states:

> Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

In applying FELA, courts have adopted a "standard of liberal construction" in order to effect FELA's broad remedial purpose. *Urie v. Thompson,* 337 U.S. 163, 180, 69 S.Ct. 1018, 1030, 93 L.Ed. 1282 (1949).

In *Atchison, Topeka and Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 567–68, 107 S.Ct. 1410, 1417, 94 L.Ed.2d 563 (1987), the Supreme Court considered but explicitly declined to decide whether § 51 creates a cause of action for "wholly mental injury." The Court, nevertheless, noted that "broad pronouncements in this area may have to bow to the precise application of developing legal principles to the particular facts at hand." *Id.* at 570, 107 S.Ct. at 1418. This statement in conjunction with the Court's discussion of the common law emotional distress torts and its observation that "FELA jurisprudence gleans guidance from common-law developments," seems, notwithstanding the Court's explicit refusal to decide the issue, to invite the lower federal courts to entertain suits for emotional injury under FELA in accordance with common law principles of negligent and intentional infliction of emotional distress. *See Id.* at 568, 107 S.Ct. at 1417 (citing *Urie,* 337 U.S. at 174, 69 S.Ct. at 1027).

However, in rejecting the argument that if such a tort were recognized the federal courts would be inundated with specious claims, the Court stated:

> This parade of horribles mistakenly assumes that a significant percentage of employees bringing grievances suffer the type of *severe emotional injury* that has generally been required to establish liability for purely emotional injury, and that a significant percentage of employees are subject to the type of *unconscionable abuse* which is a prerequisite to recovery.

---

**3.** The specific medications are not identified in   the deposition transcript.

480 U.S. at 566 n. 13, 107 S.Ct. at 1416 (emphasis added). This statement appears to require "severe emotional injury" and "unconscionable abuse" as prerequisites for an emotional distress claim under FELA, should such a cause of action be recognized. Moreover, because the Court spoke of "emotional injury" in general and did not differentiate between intentional and negligent infliction of emotional distress, it appears that the prerequisites of "severe emotional injury" and "unconscionable abuse" are to be applied regardless of whether the defendant's tortious conduct is characterized as intentional or unintentional. It seems that without recognizing the cause of action for emotional distress, the Court, nevertheless, managed to limit its scope. As the First Circuit has noted, the *Buell* opinion was "an attempt to leave the door to recovery for wholly emotional injury somewhat ajar but not by any means wide open." *Moody v. Maine Central R.R. Co.*, 823 F.2d 693, 694 (1st Cir.1987).

In the wake of the Supreme Court's opinion in *Buell*, the circuits are divided as to whether FELA creates a cause of action for emotional distress. *See Ray v. Consolidated Rail Corporation*, —— U.S. ——, 112 S.Ct. 914, 116 L.Ed.2d 813 (1992) (White, J., dissenting from denial of certiorari). The Ninth Circuit has adhered to its decision in *Buell*, subsequently affirmed in part and vacated in part by the Supreme Court on other grounds, that railroad employees may assert claims for wholly mental injury. *Taylor v. Burlington Northern R.R. Co.*, 787 F.2d 1309, 1313 (9th Cir.1986) (citing *Buell v. Atchison, Topeka & Santa Fe Railway*, 771 F.2d 1320 (9th Cir.1985), *aff'd in part, vacated in part*, 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987)). In *Buell*, the Ninth Circuit concluded that an employee's claim that he suffered an emotional breakdown as a result of "his supervisor's and co-worker's harassment, threats and intimidation" was covered by FELA. 771 F.2d 1321, 1324.

Reasoning that the purpose of FELA is to safeguard railroad employees from physical as opposed to emotional or psychological hazards, the Seventh Circuit, in an opinion by Judge Posner, held that FELA does not create a cause of action for tortious acts that do not involve physical contact or the threat of physical contact. *Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807, 813 (1985). The Seventh Circuit has adhered to *Lancaster*, despite the Supreme Court's invitation to entertain suits for emotional injury. *See Ray v. Consolidated Rail Corporation*, 938 F.2d 704 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 914, 116 L.Ed.2d 813 (1992); *Gillman v. Burlington Northern R.R. Co.*, 878 F.2d 1020 (7th Cir.1989); *Hammond v. Terminal R.R. Ass'n of St. Louis*, 848 F.2d 95 (7th Cir.1988).

Relying in part on the Seventh Circuit's decision in *Lancaster*, the Sixth Circuit has held that FELA does not give rise to a cause of action for intentional infliction of emotional distress. The court concluded that although FELA has been applied to intentional torts despite statutory language in § 51 that appears to limit its application to negligence actions, "FELA has not been applied to any intentional torts lacking any physical dimension such as assault." *Adkins v. Seaboard System Railroad*, 821 F.2d 340, 341 (6th Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 452, 98 L.Ed.2d 392 (1987); *see also Campbell v. Pan American World Airways, Inc.*, 668 F.Supp. 139, 144–145 (E.D.N.Y.1987) (following Sixth Circuit). The Sixth Circuit, however, explicitly declined to decide whether negligent infliction of emotional distress is actionable under FELA. *Adams v. CSX Transp., Inc.*, 899 F.2d 536 (6th Cir.1990); *Stoklosa v. Consolidated Rail Corp.*, 864 F.2d 425 (6th Cir.1988).

The Third Circuit, apparently following the Supreme Court's suggestion to "appl[y] developing legal concepts to the facts at hand", *Buell*, 480 U.S. at 570, 107 S.Ct. at 1418, has engaged in limited, fact-specific inquiries, and has refused to establish any bright-line rules. In *Holliday v. Consolidated Rail Corp.*, 914 F.2d 421 (3d Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 970, 112 L.Ed.2d 1057 (1991), plaintiff, although unqualified, was assigned to work as a conductor. As a result of his frequent

mistakes, plaintiff experienced job related stress which manifested itself in the form of heart palpitations, sleep disorders, a spastic colon, tenesmus, involuntary rectal discharge, anxiety and depression. The court upheld summary judgment in favor of defendant concluding that the "allegedly tortious activity ... was simply an ordinary management decision and was not of such a character that [the employee's] emotional reaction and related physical consequences constituted an 'injury' compensable under FELA." *Id.* at 425. In *Outten v. National R.R. Passenger Corp.*, 928 F.2d 74, 79 (3d Cir.1991), the court, following *Holliday*, refused to adopt a general rule allowing a plaintiff to recover for emotional injuries if circumstances were such that he reasonably feared personal physical injury. Based on the facts in that case— plaintiff complained of emotional injury from a train collision that occurred over a mile away—the court upheld the grant of summary judgment for defendant. *Id.* at 79. Both *Holliday* and *Outten* were decided over Judge Mansmann's dissenting opinion that emotional distress is actionable under FELA. *See Holliday*, 914 F.2d at 427 (Mansmann, J., dissenting); *Outten*, 928 F.2d at 79 (same).

Other circuits have avoided the general question of whether FELA covers emotional distress claims by following the Supreme Court's approach to the issue—that is, by determining that the elements of the cause of action are not present without deciding whether, if they were, the cause of action would be viable. For instance, in upholding a grant of summary judgment in favor of defendant in *Moody*, the First Circuit declined to address the general issue because even if wholly emotional injuries were cognizable under FELA, the plaintiff had failed to adduce sufficient evidence of causation. 823 F.2d at 694.

Similarly, courts have avoided the general question by focusing on the prerequisites to recovery set forth in *Buell*—"un-

conscionable abuse" and "severe emotional injury"—and in defining these terms have followed *Buell*'s suggestion to "glean guidance from common law developments." *See, e.g., Gaston v. Flowers Transportation*, 866 F.2d 816, 820 (5th Cir.1989) (applying Louisiana law). To prevail at common law, a plaintiff must establish that the defendant's conduct was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)); *see also Mello v. Stop & Shop Companies, Inc.*, 402 Mass. 555, 524 N.E.2d 105 (1988); *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988 (1987); *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985). "The requirements of the rule are rigorous, and difficult to satisfy." [4] W. Page Keeton et al., *Prosser and Keeton on Torts* § 12, at 56–57 (5th ed. 1984).

In *Elliott v. Norfolk & Western Ry. Co.*, 910 F.2d 1224 (4th Cir.1990), plaintiff claimed that she experienced emotional distress as a result of (1) accusations that she had prepared erroneous operations reports; (2) her assignment to tasks that required lifting despite a back ailment; and (3) an inquiry from a supervisor questioning whether she properly had performed a certain task. The court upheld dismissal on grounds that the defendant's conduct "never rose to the level of being outrageous or amounting to unconscionable abuse." *Id.* at 1230. In so holding, the Fourth Circuit followed an earlier Fifth Circuit decision, *Netto v. Amtrak*, 863 F.2d 1210 (5th Cir. 1989). In *Netto*, the plaintiff, an Amtrak police officer, was questioned about his investigation of a rape at an Amtrak coach yard and was asked to submit to a poly-

---

**4.** Comment d of Restatement (Second) of Torts § 46 also states:

It has not been enough [to establish liability] that defendant has acted with an intent which is tortious or even criminal, or that he has

intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

graph examination. On the day of the polygraph examination, plaintiff was hospitalized for a nervous breakdown. In holding that plaintiff failed to impute outrageous or unconscionable conduct to Amtrak, the court noted that Amtrak was required to investigate such crimes and did so in an efficient and reasonable manner. *Id.* at 1215; *see also Plaisance v. Texaco, Inc.*, 966 F.2d 166 (5th Cir.1992) (where plaintiff has not satisfied tort of emotional distress there is no need to decide whether FELA permits recovery for mental injury); *Gaston*, 866 F.2d at 821 (no recovery under Jones Act for mental anguish resulting from tortious act directed at a third person).

Judge Ward of this Court employed similar reasoning in *Cohen v. Metro–North Commuter Railroad Co.*, No. 89 Civ. 7498, 1991 WL 4699 (S.D.N.Y. Jan. 11, 1991), a case remarkably similar to the case at hand. Between 1984 and 1986, Cohen, a trainman, complained of numerous unfair labor practices and violations of the collective bargaining agreement on the part of Metro–North. Specifically, Cohen complained that supervisory personnel were placing friends and relatives in senior positions and giving them preferential treatment, regardless of seniority. Cohen maintained that because of his complaints to the union, managers falsely accused him of work rule violations and singled him out for discipline while other employees' violations were ignored. Cohen alleged that as part of this harassment he was denied advanced training in favor of several less-qualified, junior employees and, therefore, became ineligible for promotion. Finally, Cohen claimed that he was fired because a supervisor purposely instigated an altercation by ordering him off company property. Following a hearing pursuant to the collective bargaining agreement, Cohen was reinstated with back pay. He then sued Metro–North alleging, *inter alia*, infliction of emotional distress.

After discussing *Buell*, Judge Ward concluded that Cohen failed to allege the outrageous conduct necessary to support a claim for infliction of emotional distress. *Id.* at 3. He reasoned that "FELA was not intended to permit recovery for the natural distress felt by an employee who believes he has a legitimate grievance against his employer." *Id.*

As in *Elliott, Netto* and *Cohen*, the conduct described by this plaintiff does not constitute "unconscionable abuse," *Buell*, 480 U.S. at 566, n. 13, 107 S.Ct. at 1416, n. 13; nor is it "beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, cmt. d (1965). Therefore, summary judgment in favor defendant is appropriate on plaintiff's FELA claims and there is no need to address the question whether, had plaintiff adduced evidence sufficient to satisfy the elements of the tort, such a claim would be actionable under FELA. Moreover, because plaintiff has failed to show "unconscionable abuse," there also is no need to address the question whether she has made a sufficient showing of "severe emotional injury" or to decide to what extent, if any, physical symptoms need be present to permit recovery for emotional distress. *See Elliott*, 910 F.2d at 1230 n. 6.

The 54 "incidents of harassment" described in plaintiff's deposition testimony are primarily disputes over working conditions, jobs, rates of pay and other matters governed by the collective bargaining agreement. Over half involve: (1) disputes over shifts and positions which she claims she was entitled to work (Incidents 4, 9, 19, 22, 25, 26, 29, 32, 33, 35, 38, 44, 45, 53);[5] (2) hours she had worked (Inc. 7, 28); and (3) her inability to obtain positions and displace other Conrail employees. (Inc. 15, 16, 17, 18, 23, 31, 36, 37, 39, 43) In seeking redress for these incidents, plaintiff has taken full advantage of the grievance procedure established by the collective bargaining agreement. According to her testimony, she has filed 15 grievances as a result of this type of incident; four were denied and are currently on appeal (Inc. 16, 29, 32, 33); she has received compensation for two (Inc. 4, 51); the balance are pend-

---

**5.** Hereinafter, citations to specific incidents will appear as follows: (Inc. __)

ing. However, of those pending or on appeal, six involve secretarial positions held by Conrail employees Staples or McGregor for which plaintiff specifically had been disqualified by a hearing officer. (Inc. 16, 18, 23, 31, 36, 37) It therefore appears that rather than a pattern of unconscionable abuse by Conrail's managers, these incidents involve disagreements regarding interpretation of the collective bargaining agreement. In fact, as evidenced by the results of plaintiff's numerous filings and the merits of the appealed and pending claims, it seems that often what plaintiff labels harassment actually arises from plaintiff's own misunderstanding of her rights under the collective bargaining agreement.

Workplace disputes over hours, shifts and wages properly are resolved through the grievance procedures set forth in collective bargaining agreements and the mandatory statutory mechanisms.[6] Disgruntled employees cannot transform such disputes into tort actions simply because they are dissatisfied with the results of the appropriate procedures. *Feldleit v. Long Island Railroad,* 723 F.Supp. 892, 901 (E.D.N.Y. 1989); *see also Murphy,* 58 N.Y.2d at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (plaintiff cannot avoid contract rules by casting cause of action in the guise of an emotional distress tort). Nor should courts define the "unconscionable abuse" element of emotional distress so as to include normal disputes over wages, hours and positions, such as those described by plaintiff, and thereby discourage managers from effectively administering collective bargaining agreements for fear of upsetting employees and subjecting the corporation to liability in tort.

Four of the incidents described by plaintiff involve alleged fabrication of work rule violations. These include Palumbo's

charge that plaintiff was insubordinate (Inc. 1), Gallagher's charges following the oil spill (Inc. 2), the charge that plaintiff reproduced and removed confidential documents (Inc. 5), and the procedurally deficient Appendix II letter (Inc. 40). Again plaintiff has taken full advantage of the hearing and grievance procedures, and again the results are mixed. Plaintiff's testimony reveals that she was exonerated of the insubordination charge, found guilty of the record charge by a hearing officer, had the Appendix II letter changed to a less serious Appendix I letter on procedural grounds, and had one of Gallagher's charges dismissed for insufficient evidence. Thus, even on her own testimony, plaintiff is not a model employee: a hearing officer determined that she was guilty of the most serious of the charges, and the Appendix I letter indicates that there is some problem with absenteeism. Therefore, management's resort to formal disciplinary procedures can by no means be labeled unacceptable or intolerable behavior.

The other incidents cited by plaintiff involve personal disputes with managers and co-workers. (Inc. 2, 6, 7, 8, 10, 12, 14, 20, 24, 27, 34, 41, 46, 47, 49, 50, 51, 52) Some reflect plaintiff's dissatisfaction with management's attempts to carry out company procedures. For instance, she complains of Weber's attempt to obtain a statement following her accident (Inc. 2), being disciplined on two occasions for wearing high-heeled shoes in violation of company safety standards (Inc. 6, 34), being paid for three rather than four hours for attending a three-hour hazardous waste class (Inc. 28), having her time card challenged by Wagner (Inc. 47), and having to sign in at the time she entered the building rather than at the time she drove in to the parking lot. (Inc. 52) Other incidents reflect plaintiff's unhappiness with the tasks assigned her by

**6.** The Railway Labor Act, 45 U.S.C. §§ 151–163 ("RLA") sets forth administrative procedures for the resolution of labor disputes in the railroad industry. Minor disputes—those "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working violations"—must be addressed first through the railroad's internal grievance procedure and, if not settled, may

then be submitted to a panel of arbitrators. 45 U.S.C. § 153. This remedy is not exclusive and an employee may pursue remedies under both RLA and FELA. *Buell,* 480 U.S. at 564–568, 107 S.Ct. at 1415–17. At issue here is not whether Conrail's grievance mechanism and the RLA provide plaintiff's sole means of redress; rather, the question is whether plaintiff has alleged conduct actionable under FELA.

certain managers: Palumbo insisting she revise letters "up to eight times" and assigning "more important" work to others (Inc. 8), Gallagher asking her to type denials of her claims (Inc. 10), and Palumbo requiring her to fill in at several positions on a single shift. (Inc. 27)

The remaining incidents appear to be personality conflicts with managers ranging from the trivial—Palumbo's "whispering" about plaintiff and excluding her from conversations (Inc. 8), Birnbaum's inquiries regarding business at South Kearney (Inc. 14), a supervisor's allowing another employee to leave early (Inc. 50), and Wagner's sending certified letters to plaintiff's home during her vacation (Inc. 41)—to incidents where managers allegedly used obscene language (Inc. 11, 21), laughed at plaintiff (Inc. 10), acted "belligerent[ly]" towards plaintiff (Inc. 3, 44), or "humiliat[ed]" plaintiff in front of co-workers. (Inc. 20) But these incidents, however upsetting to plaintiff, amount to nothing more than personality conflicts and workplace disputes that frequently arise between managers and employees. To cast an employer into liability based on such conduct would be to undermine the unconscionable abuse standard which is designed specifically to prevent the tort of emotional distress from becoming the weapon of every disgruntled employee. *See Buell*, 480 U.S. at 566 n. 13, 107 S.Ct. at 1416. Because the incidents described by plaintiff cannot be characterized as " 'atrocious and utterly intolerable in a civilized community,' " they do not support her claim for emotional distress. *See Murphy*, 58 N.Y.2d at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (quoting Restatement (Second) of Torts § 46, cmt d (1965)).

Finally, plaintiff describes several incidents—Borelli's "brush[ing] close" to plaintiff (Inc. 21), Borelli and Gallagher's use of obscene language in the workplace (Inc. 11, 21), Birnbaum's picking on female employees (Inc. 13) and "hang-up" calls made to her home (Inc. 21)—which she terms "sexual harassment." Notwithstanding plaintiff's characterization, the underlying facts as set forth in plaintiff's testimony show that these alleged incidents do not amount to outrageous or unconscionable conduct within the meaning of the cases that define infliction of emotional distress.

Regarding the incident of Borelli's "brushing close," plaintiff did not report the incident until the day Borelli attempted to enforce her suspension, months after the alleged brushing occurred, and although at the time she reported the incident she was ready to accuse Borelli of a litany of misdeeds, at her deposition the sexual advances became "hang-up calls" and "suggestive language" and the sexual harassment became a single incident of "brushing close" for one or two minutes. In fact, at her deposition, plaintiff could not decide whether the incident lasted a minute or two or whether as soon as she sensed someone "she moved away very quickly." (Dep. at 23) Regarding Borelli's "suggestive language," plaintiff could not recall the details of what he said nor how his language differed from the language used as a matter of course by other managers. (Dep. at 31–32)

Plaintiff also accused Gallagher of using obscene language. However, plaintiff conceded that Gallagher never used such language with her in private, never propositioned her, and that his use of such language was "lighthearted." (Dep. at 95)

Plaintiff maintains also that Birnbaum was "very condescending" and "picked on" female employees. (Dep. at 100–101, 106) But other than her assertion that Birnbaum would repeat information learned from plaintiff in conversations with other managers, hardly an unconscionable act, plaintiff does not describe any specific instances where Birnbaum's intimidating conduct was directed at her.

Finally, plaintiff accuses both Borelli and Birnbaum of making "hang-up" and "dirty" phone calls to her home. (Dep. at 26, 107–108) She bases this accusation on the fact that she received these calls at times when her relations with Borelli and Birnbaum were particularly strained. Plaintiff admitted, however, that because of the nature of the calls, she could not identify the caller. (Dep. at 108) "Al-

though plaintiffs are entitled to the benefit of all reasonable doubt in determining whether a genuine issue of material fact exists, mere conjecture or speculation will not suffice to avoid summary judgment." *Fox-Knapp, Inc. v. Employers Mut. Cas. Co.*, 725 F.Supp. 706, 708 (S.D.N.Y.1989), *aff'd*, 893 F.2d 14 (2d Cir.1989). On this record, the incidents plaintiff calls "sexual harassment" do not amount to unconscionable conduct by defendant.

On the whole, plaintiff has described a long but otherwise unexceptional list of disputes with Conrail management. Disagreements regarding the collective bargaining agreement, disputes over the propriety of invoking formal disciplinary procedures, personality conflicts between managers and employees and even outright manifestations of personal distaste for an employee do not constitute the type of unconscionable abuse or outrageous behavior for which tort law provides a remedy.

> "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's [*sic*] feelings are hurt."

*Kraus v. Consolidated Rail Corp.*, 723 F.Supp. 1073, 1089 (E.D.Pa.1989) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)); *see Buell*, 480 U.S. at 569 n. 16, 107 S.Ct. at 1418 n. 16 (" 'The tort of intentional infliction of mental distress as described in § 46 of the Restatement ... can be safely characterized as the general rule in the United States.' ") (quoting *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1066 (Wyo.1986)). Plaintiff's claims for emotional distress are dismissed.

### III.

Although as described by plaintiff, the incidents she labels as sexual harassment do not, on this record, support a claim of infliction of emotional distress, plaintiff may be able to discover and present additional evidence necessary to establish a claim of sexual harassment. *See Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Because plaintiff has not proceeded on a sexual harassment theory to this point, she will be given an opportunity to amend her complaint to include a claim for sexual harassment, assuming without deciding that she has a good faith basis for doing so. *Cf. Ross v. A.H. Robins Co.*, 607 F.2d 545, 549 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

SO ORDERED.