Sharlene F. ELLIOTT,
Plaintiff–Appellant,

v.

NORFOLK & WESTERN RAILWAY COMPANY, a Virginia Corporation, Defendant–Appellee.

No. 89–2774.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1990.

Decided Aug. 17, 1990.

Kathryn Reed Bayless, Law Offices of Kathryn Reed Bayless, Princeton, W. Va., for plaintiff-appellant.

Wade Thomas Watson, Sanders, Watson & White, Bluefield, W. Va., argued. (David L. White, Sanders, Watson & White, Bluefield, W. Va., on brief), for defendant-appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.

REBECCA BEACH SMITH, District Judge:

Sharlene F. Elliott ("Elliott") brought this suit under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. §§ 51, et seq. (1982), against her former employer, Norfolk & Western Railway Company ("N & W"), for emotional distress she allegedly suffered as a result of certain disputes in the workplace with her supervisors. The district court granted N & W's motion for summary judgment, holding that there is no cause of action under the FELA for purely emotional injury. Elliott now appeals that decision, urging this court to adopt the position that a claim for emotional injury is cognizable under the FELA. For the reasons stated below, we affirm the decision of the district court.

## I.

Elliott was first employed by N & W in June 1978 as a clerk in the superintendent's office in Bluefield, West Virginia. From 1980 until shortly before the end of her employment on August 23, 1987, she worked as an "extra board" employee. The extra board is, in essence, a team of replacement employees maintained by the railroad to fill positions when regular employees are absent. Because an extra board employee may be called to work in a variety of job classifications, an individual must be able to perform competently in several positions in order to qualify for the extra board.

The principal facts in this case concern three separate incidents of mistreatment alleged by Elliott. The first of these incidents occurred in November 1986, when Elliott was working in the car distributor's office. This office prepares a daily report, commonly known as a CT–16 report, which details the location and movement of coal cars. The daily report for November 7, 1986, prepared by Elliott, contained an error. The chief dispatcher on the night shift, Mark Webb, noticed the error while completing the CT–16 report for November 8, 1986, and he attached a short memorandum to his report before submitting it. In the memo, Webb stated that the November 7 report had been prepared by Elliott and that his purpose in writing the memo was not to have her disciplined, but simply to have the reports reflect accurate data. Emory Hill, trainmaster at the Bluefield terminal, claimed he wanted Elliott to be aware of the error in order to prevent similar errors in the future, so he sent her a copy of Webb's memorandum with a note attached, which read: "S.F. Elliott, note the attached, avoiding a further recurrence." Elliott was not formally reprimanded in regard to this incident.

N & W concedes that no one determined how the mistake was made or whether Elliott was actually the person who made the error. Believing she had been falsely accused, Elliott requested an unjust treatment hearing pursuant to the collective bargaining agreement. Elliott requested the hearing on November 22, 1986. Due to delays on the part of N & W, the hearing was not conducted until March 21, 1987. The hearing brought to light the fact that

the error found in the CT–16 report for November 7, 1986, was not attributable to Elliott but was instead the result of inaccuracies in the historical data incorporated into the report. Elliott contends that this occurrence produced feelings of insecurity and anxiety.

The second in the series of events which allegedly culminated in Elliott developing a panic disorder centers on her being called to work the messenger/cab supply position. One of the jobs which Elliott was required to fill as an extra board employee was that of messenger/cab supply. This position required cleaning the cabooses and furnishing them with needed supplies. It did call for some lifting in order to place supplies in the caboose. Elliott maintains that as a result of a medical examination required by N & W in September 1985, she was restricted by her physician from lifting heavy objects, since she suffered from back pain and muscle spasms. A memorandum relating her condition and the restrictions on her work duties was placed in Elliott's personnel file. In October 1985, D.K. DeCamp, Elliott's supervisor at the time, also agreed to remove her from the rotation for the messenger/cab supply position.

In November 1986, Emory Hill assigned Elliott to work messenger/cab supply. At that time, he was informed that because of her back problems, Elliott had been excused from working this job. In light of this information, Hill changed the assignment and told Elliott not to report for duty. Shortly thereafter, Hill contacted the medical director of N & W, Dr. George Ford, inquiring as to medical restrictions on Elliott. On February 5, 1987, Dr. Ford issued a medical disqualification form indicating that Elliott was qualified to work as a messenger, so long as she performed no heavy lifting. N & W contends that Elliott was informed of Dr. Ford's decision by the assistant superintendent, A.F. Williams, Jr., on February 10, 1987. Elliott contends that she was not advised of Dr. Ford's decision. She was called to work as a messenger on February 21, 1987. Elliott asserts that even though she reported to work on February 21, and was not required to do any jobs involving heavy lifting, she performed her duties with the "fear" that she would be required to lift heavy items because she was unaware of the medical disqualification issued by Dr. Ford.

When Elliott reported to work on February 21, she submitted a letter stating that her physician felt it was inadvisable for her to even try working a job which required lifting or frequent vehicle embarkation or any activity which "might cause an additional twisting of the lower lumbar spine." Because of this letter, N & W required Elliott to see Dr. Roy R. Raub, an orthopedist, for a physical examination. Dr. Raub found that she suffered from a chronic disc problem and, therefore, that she should not work as a messenger. Based on Dr. Raub's diagnosis, Dr. Ford issued a new medical disqualification on April 7, 1987, this time restricting her from "all positions that require heavy lifting, repeated entry or exit from vehicles, and walking on uneven terrain."

Since many of the jobs performed by extra board employees required physical activity which Elliott had been disqualified from doing, she was removed from the extra board to a regular, but lower paying, job as a relief caller. In this position, Elliott was required to call individual employees and have them report to work. If an employee was unavailable, could not be reached, or failed to report for duty, a caller had to "mark off" that employee and find another to perform the work. In addition, if a train or engine service employee marked off, the caller was required to notify Emory Hill in writing by the end of his or her work shift. Elliott expressed concern over her ability to perform her new duties in a satisfactory manner because she felt that she had not been given enough time to learn her job. An event which took place while she worked as a caller constitutes the third incident of mistreatment alleged by Elliott.

On August 12, 1987, F.L. Benton, a train service employee, marked off after receiving a call to report from Elliott. Benton had a history of marking off. During an investigation of Benton for a previous incident, Hill learned that Benton had marked

off on August 12 and that it had gone unreported. When Hill discovered that Elliott was the caller, he left her a note which stated: "S.F. Elliott—Did you report to a railroad official that F.L. Benton marked off after being called ... on August 12, 1987?" Elliott admits that this note was the only communication concerning this incident. Elliott, upon receipt of the note, concluded that she was going to be the subject of an investigation. She became angry because she felt targeted by the railroad. According to her deposition testimony, she became extremely weak and shaky.

Elliott now maintains that she suffers from a panic disorder as a result of N & W's actions toward her. Elliott concedes that her psychological condition is not the product of any physical contact. Instead, she alleges that due to the negligent conduct of N & W employees, she was subjected to mental distress which manifested itself in the form of the following symptoms: dizziness, weakness, faintness, stuttering, uncontrollable crying, inability to sleep normally, severe headaches, and extreme fatigue.

## II.

Elliott asserts that the district court erred in holding that the FELA does not provide a cause of action for purely emotional and mental injury which is not induced by physical contact or threat thereof, or which does not manifest itself beyond those physical symptoms typically associated with emotional distress. In support of her position, Elliott relies on the Supreme Court's ruling in *Atchison, Topeka & Santa Fe Railway Co. v. Buell*, 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987). In *Buell*, the Court recognized that the purpose of the FELA is to provide railroad workers with a broad federal remedy for injuries sustained due to the negligence of

their employers or co-workers.[1] *Id.* at 561–62, 107 S.Ct. at 1413–14. However, the Court expressly refused to decide whether "purely emotional injuries are cognizable under the FELA...." *Id.* at 567, 107 S.Ct. at 1417. Even though the Supreme Court declined to decide this issue, it rejected the argument that by allowing FELA actions for emotional injuries, the federal courts would be inundated with claims that otherwise would have been pursued through the grievance process of the Railway Labor Act. *Id.* at 566 n. 13, 107 S.Ct. at 1416 n. 13. Specifically, the Court stated:

This parade of horribles mistakenly assumes that a significant percentage of employees bringing grievances *suffer the type of severe emotional injury that has generally been required to establish liability for purely emotional injury,* and that a significant percentage of employees are *subject to the type of unconscionable abuse which is a prerequisite to recovery.*

*Id.* (citation omitted) (emphasis added). Later in its opinion, the Court, in discussing the possibility of allowing recovery for such claims, indicated "whether one can recover for emotional injury might rest on a variety of subtle and intricate distinctions related to the nature of the injury and the character of the tortious activity." *Id.* at 568, 107 S.Ct. at 1417. The focus of the Court's discussion, then, was on the severity of the emotional injury and the type of conduct causing the injury.

Additionally, the Court in *Buell* acknowledged "that FELA jurisprudence gleans *guidance* from common-law developments," 480 U.S. at 568, 107 S.Ct. at 1417 (emphasis added) (citing *Urie v. Thompson,* 337 U.S. 163, 174, 69 S.Ct. 1018, 1026, 93 L.Ed. 1282 (1949)), and then it generally reviewed developing state law on the question. *Id.* 480 U.S. at 568–70, 569 nn.17, 18, 20 & 21, 107 S.Ct. at 1417–18, 1417 nn.17,

---

**1.** Section 1 of the FELA, 45 U.S.C. § 51 (1982), provides in pertinent part:

Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... result-

ing in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

18, 20 & 21.[2] Because of the differences in state law with respect to the torts of intentional and negligent infliction of emotional distress, "the question whether one can recover for emotional injury may not be susceptible to an all-inclusive 'yes' or 'no' answer." *Id.* at 570, 107 S.Ct. at 1418.[3]

Finally, the Court specifically referred to the importance of scrutinizing the facts of any claim for emotional injury under the FELA, stating:

> The question whether "emotional injury" is cognizable under the FELA is not necessarily an abstract point of law or a pure question of statutory construction that might be answerable without exacting scrutiny of the facts of the case.... As in other areas of law, broad pronouncements in this area may have to bow to the precise application of developing legal principles to the particular facts at hand.

*Id.* at 568–70, 107 S.Ct. at 1417–18; *see* 480 U.S. at 570 n.22, 107 S.Ct. at 1418 n.22 (specific facts of the *Buell* case noted). The Court of Appeals for the Fifth Circuit has interpreted the *Buell* decision as an invitation to the lower courts "to parse the FELA in light of the specific facts of later cases." *Netto v. Amtrak*, 863 F.2d 1210, 1213 (5th Cir.1989). The Court in *Netto* then affirmed the grant of summary judgment by the district court on the ground that the undisputed facts did not show unconscionable or outrageous conduct by Amtrak. *Id.* at 1214–15; *see also Gaston v. Flowers Transp.*, 866 F.2d 816, 818, 821 (5th Cir.1989) (quoting *Netto* and denying recovery on the specific facts of the case). In *Netto*, a railroad police officer was fired by Amtrak following a nervous breakdown. 863 F.2d at 1212. The nervous breakdown allegedly was caused by Amtrak's harassment of Netto during an investigation into improprieties in the railroad's police depart-

ment. *Id.* The court refused to reach whether Amtrak's actions caused the emotional injury or whether Netto could recover for purely emotional injury under the FELA. *Id.* at 1214–15. Rather, the court determined that Netto had failed to show unconscionable or outrageous conduct by Amtrak, an essential element of the claim. *Id.* at 1215.

Three other circuits have addressed the issue of whether the FELA affords a cause of action for emotional injury in light of the *Buell* decision. The Sixth Circuit, in *Adkins v. Seaboard System Railroad*, 821 F.2d 340, 342 (6th Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 452, 98 L.Ed.2d 392 (1987), held that a claim for intentional infliction of emotional distress is not cognizable under the FELA when the injury alleged is purely emotional. *See also Adams v. CSX Transp.*, 899 F.2d 536, 539 (6th Cir.1990) (denial of claim under FELA for emotional injury based upon failure to prove even traditional elements of negligence). In *Adkins*, plaintiff sought damages for emotional distress and physical pain resulting from the defendant's alleged conspiracy to fire him. 821 F.2d at 341. The Sixth Circuit noted that while the FELA has been applied to some intentional torts, even though the text of the statute speaks only in terms of negligence, "the FELA has not been applied to any intentional torts lacking any physical dimension such as assault." *Adkins*, 821 F.2d at 341 (citations omitted); *see Buell*, 480 U.S. at 562 n. 8, 107 S.Ct. at 1414 n. 8 (Court notes broad construction of FELA to cover some intentional torts, despite text of statute only mentioning negligence, and cites cases so holding).

The Seventh Circuit also has taken the position that injuries compensable under the FELA are limited to those which are

**2.** The Court recognized the varying requirements of the states to support a claim for emotional injury. Among these requirements are: the degree of intent required to support the claim, the severity of emotional injury as evidenced by the resulting physical symptoms, the relationship shared by the parties, and the necessity for actual or threatened impact between the tortfeasor and the plaintiff. *Buell*, 480 U.S.

at 568–69, 569 n. 20, 107 S.Ct. at 1417–18, 1418 n. 20. The Court noted that the latter requirement of physical impact has been abandoned by a majority of the states. *Id.* at 569 n. 20, 107 S.Ct. at 1418 n. 20.

**3.** *See infra* note 5 for effect of West Virginia law on this case.

the result of tortious conduct involving physical contact or threats of physical contact. In *Hammond v. Terminal Railroad Association,* 848 F.2d 95, 96 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1170, 103 L.Ed.2d 229 (1989), plaintiff accused the railroad of

> unfairly criticizing the plaintiff's work, prosecuting unwarranted disciplinary charges against him, setting unrealistic work quotas and "wearing him out physically and mentally thereby," harassing him by "keeping an extraordinarily close watch on [his] work and following him from work assignment to work assignment," conducting disciplinary proceedings against him unfairly ... and ... deliberately inflicting emotional distress on him.

Relying on its previous decision in *Lancaster v. Norfolk & Western Railway Co.,* 773 F.2d 807, 813 (7th Cir.1985), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987) (FELA does not provide a cause of action to those persons who claim that their injuries are the result of actions lacking physical contact or a threat thereof), the court in *Hammond* denied relief. The Seventh Circuit stated that even though the Supreme Court reserved this issue in *Buell,* even Buell's allegations of tortious conduct included an actual assault. *Hammond,* 848 F.2d at 98; *see Buell,* 480 U.S. at 570 n. 22, 107 S.Ct. at 1418 n. 22.

The First Circuit, in *Moody v. Maine Central Railroad Co.,* 823 F.2d 693, 694, 696 (1st Cir.1987), declined to decide the issue left open by *Buell* and instead affirmed a summary judgment for the railroad, concluding that plaintiff had failed to show that the railroad's actions caused him to suffer severe emotional injury. Plaintiff claimed that the railroad negligently injured him by continually denying him admission into an engineer training program,

by assigning him to undesirable locations, by denying his qualification for certain runs, and by recommending in a letter written by his supervisor that no future employees like the plaintiff be selected for training or advancement. *Id.* at 693. Plaintiff's alleged injury consisted only of subjective pain. *Id.* at 696.

### III.

With this review of *Buell* and the circuit court authorities interpreting it, we now address plaintiff's claim and follow the course chosen by the Fifth Circuit in *Netto* in affirming the grant of summary judgment in favor of defendant. Specifically, we do not decide in this case whether one may recover under the FELA for purely emotional injuries without additional physical symptoms [4] because, even if the court were to find such claims cognizable under the FELA, this plaintiff has failed to make a sufficient showing of unconscionable abuse or outrageous conduct, an essential, threshold element of the claim. *See Buell,* 480 U.S. at 566 n. 13, 107 S.Ct. at 1416 n. 13; *Netto,* 863 F.2d at 1214–15.[5] Summary judgment is appropriate when the party with the burden of proof fails to make a showing sufficient to establish the existence of an element essential to the party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, the record facts of the case and the inferences reasonably to be drawn from them must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Importantly, summary judgments are reviewed *de novo* on appeal. *Higgins v. E.I. Du-*

---

4. *See infra* note 6.

5. In granting summary judgment, the district court relied, in part, on *Harless v. First National Bank,* 169 W.Va. 673, 289 S.E.2d 692 (1982), for the proposition "that West Virginia does not recognize a cause of action for the negligent infliction of emotional distress...." *Elliott v. Norfolk & W. Ry.,* 722 F.Supp. 1376, 1378 (S.D. W.Va.1989). Because Elliott has failed to dem-

onstrate the threshold requirement of "unconscionable abuse" on the part of N & W, we need not address the status of West Virginia law in this area, and affirm the district court's decision solely on the basis that a prerequisite to any permitted recovery under the FELA for emotional injury has not been shown. *See Buell,* 480 U.S. at 566 n. 13, 107 S.Ct. at 1416 n. 13.

*Pont de Nemours & Co.*, 863 F.2d 1162, 1166–67 (4th Cir.1988); *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1127–28 (4th Cir.1987). Viewing *de novo* the undisputed material facts of this case and the inferences reasonably to be drawn therefrom in the light most favorable to Elliott, she cannot show outrageous conduct or unconscionable abuse to support her claim.

With respect to the CT–16 report, the unjust treatment hearing revealed that the error in the report was not Elliott's fault. Prior to the hearing, Elliott had not been formally reprimanded, just made aware that an error had occurred in the report. Even Elliott's supervisor, A.F. Williams, Jr., stated that he felt the mistake was minor in nature and that he was caught by surprise that Elliott would request a hearing. Due to Williams' unfamiliarity with the procedures for the hearing, it was delayed for three months.

The messenger/cab supply incident also does not rise to the level of outrageous or unconscionable action. Even assuming that Elliott feared injury to her back throughout the time she was working this job because she was not advised of Dr. Ford's first medical disqualification form restricting her from heavy lifting, she was never required to perform any work on this job which involved heavy lifting. Ultimately, Elliott was disqualified from performing any activities which could result in injury to her lower back.

Finally, with respect to the caller incident, Elliott admittedly did not report Benton's mark off in writing by the end of her shift as instructed. Again, she simply was sent a note asking whether she had reported the mark off. Hill naturally questioned what happened, since operating procedure was not followed and since Benton had a history of marking off and was under investigation for such activity.

It appears, at best, that this case involves a situation of hurt feelings and poor office relationships, not unconscionable abuse, as shown by the following deposition testimony of Elliott:

> After all, in spite of the hearing, in spite of my every effort to straighten things out, my situation was not even important enough to merit somebody coming up to me and saying, "Sharlene, this has been straightened out," or "Don't worry about this," or "We'll straighten this up. Everything's okay. Just keep cool." Nobody even bothered.

Also, in response to another deposition question asking whether N & W's employees were aware of how she was feeling, Elliott stated:

> [T]hey never showed any concern. Nobody ever came to me and asked or told me anything. They could have very easily said, "Sharlene, don't worry about that CT–16, because we have gone to Mr. Baldwin," or "we've gone to all three different assistance car distributors, plus the relief man, and we know where the errors came from. They've been corrected. Everything is cool. Don't worry about it."

These facts and the entire record presented to this court show that N & W's conduct never rose to the level of being outrageous or amounting to unconscionable abuse.[6]

## IV.

Based on the foregoing reasons, we conclude that the district court did not err in granting N & W's motion for summary judgment. Accordingly, the decision below is

**AFFIRMED.**

---

**6.** We do not reach whether this case involves the severe injury of the type noted in *Buell,* 480 U.S. at 566 n. 13, 107 S.Ct. at 1416 n. 13, including to what extent physical symptoms need to be present for any permitted recovery under the FELA for emotional injury. *See id.* at 569 & n. 18, 107 S.Ct. at 1418 & n. 18. Such a determination is unnecessary given the disposition of the case on another ground, and, in any event, it would involve disputes of fact which are not appropriate for resolution by this court. For the same reasons, we do not reach whether N & W caused Elliott's alleged injury.