Edwin Y. YBALLA, Plaintiff,

v.

SEA–LAND SERVICES, INC. In Personam, and S.S. Sea–Land Reliance, its engines, boilers, tackle, stores, freight, and furnishings In Rem, Defendants.

Civil No. 94–00886 ACK.

United States District Court,
D. Hawai'i.

Oct. 11, 1995.

Jay L. Friedheim, Honolulu, HI, for plaintiff.

Eldon M.T. Ching, Alcantara & Frame, Honolulu, HI, for Sea–Land Services, Inc.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

KAY, Chief Judge.

### BACKGROUND

Currently before the Court is the Motion for Partial Summary Judgment of Defendants Sea–Land Services, Inc. ("Sea–Land") and S.S. Sea–Land Reliance against Plaintiff Edwin Y. Yballa.

Plaintiff Yballa is a resident of Hawaii and a former crew member and oiler aboard defendant Sea–Land's cargo container ship, Sea–Land Producer.[1] Yballa joined Sea–Land Producer on June 22, 1994 in Honolulu. On August 29, 1994, while in port in Japan, at approximately 5:00 a.m., after getting off his watch at midnight, Yballa experienced chest pains and shortness of breath. On the way to the ship's hospital, he collapsed. A Japanese ambulance team arrived and took Yballa to a Japanese hospital, where doctors diagnosed him with a panic attack.[2] Yballa then was flown back to Hawaii, where he began seeing a psychiatrist. Yballa also started hearing "noises" in his head. Yballa Depo., at 85:12–24.

On November 23, 1994, Yballa filed suit against Sea–Land, alleging that he collapsed due to "stress [and] excessive abuse by his superior officer" and claiming (1) negligence under the Jones Act, 46 App.U.S.C. § 688, (2) unseaworthiness under general maritime law, and (3) maintenance and cure, and found and wages under general maritime law.[3]

On June 27, 1995, Sea–Land filed a motion for partial summary judgment, along with supporting affidavits, on Yballa's claims of Jones Act negligence, unseaworthiness and cure, arguing that (1) Yballa's claim of negligent infliction of emotional distress under the Jones Act fails to raise a genuine issue because there is no evidence Yballa was within any "zone of danger;" (2) his unseaworthiness claim fails in tandem with his Jones Act negligence claim as a matter of law; and (3) his cure claim fails because there is no evidence of any unpaid cure bills.[4]

On September 22, 1995, Yballa filed an opposition and a supporting affidavit. In his opposition, Yballa states for the first time that he also "is claiming the *intentional* infliction of emotional distress." Plaintiff's Opposition, at 9. On September 29, 1995, Sea–Land filed its reply.

On October 10, 1995, the Court heard Defendants' motion for partial summary judgment. Both parties appeared through counsel. Upon considering the papers filed by

---

1. Plaintiff erroneously has sued defendant S.S. Sea–Land Reliance, which is hereby DISMISSED as a defendant from the action. *See* Plaintiff's Opposition, at 12–13.

2. A panic attack is "[a] discrete period of intense fear or discomfort, in which four (or more) of the following symptoms developed abruptly and reached a peak within 10 minutes:

   (1) palpitations, pounding heart, or accelerated heart rate
   (2) sweating
   (3) trembling or shaking
   (4) sensations of shortness of breath or smothering
   (5) feeling of choking
   (6) chest pain or discomfort
   (7) nausea or abdominal distress
   (8) feeling dizzy, unsteady, lightheaded, or faint
   (9) derealization (feelings of unreality) or depersonalization (being detached from oneself)
   (10) fear of losing control or going crazy

   (11) fear of dying
   (12) paresthesias (numbness or tingling sensations)
   (13) chills or hot flushes."
   American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994).

3. Because an action for maintenance and cure includes "unearned wages for the period from the onset of injury or illness until the end of the voyage," Yballa's third cause of action will be referred to simply as "maintenance and cure." *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943, 946 (9th Cir.1986).

4. Yballa submitted cure bills with his opposition. In its reply, Sea–Land requests summary judgment on only Jones Act negligence and unseaworthiness, appearing to concede that summary judgment is not appropriate on Yballa's claim of cure. The Court agrees and therefore DENIES Sea–Land's motion with respect to Yballa's claim of cure.

both parties, the arguments of counsel, and the record, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' motion.

### FACTS [5]

Plaintiff Edwin Y. Yballa, 40 years of age, has worked as a merchant marine seaman since the summer of 1988. In 1990, he took the Coast Guard examination, received an endorsement and became a junior engineer. Beginning in 1990, Yballa worked as an oiler and second pump man on various vessels as a merchant marine seaman. Since recovering from his injuries aboard the Sea–Land Producer, Yballa has returned to work as a merchant marine seaman aboard the Sea–Lift Indian Ocean, the Overseas Ohio and the Long–Lines. To the best of his recollection, Yballa has never had a complaint or reprimand filed about his work as a merchant marine seaman except for his time on the Sea–Land Producer. Yballa Affid., at ¶¶ 3–7.

Yballa is a member of the S.I.U. Union, whose contract with the shipping companies requires only that Yballa work 8 hours a day in the engine room unless ordered to do so by the officer on duty because of some emergency situation.[6] Yballa, however, along with the other crew members, regularly worked up to an additional eight hours of overtime a day to earn the extra money. From June 24, 1994 through August 28, 1994, Yballa worked 374 hours of overtime, averaging 5.75 hours of overtime a day for each of the 65 days during that period. On occasion, sometimes twice a week, Yballa would decline to work overtime because he was tired.

**5.** These Facts are taken largely from Plaintiff's affidavit in support of his opposition and his deposition taken on December 27, 1994 and will be assumed true for purposes of this motion.

**6.** The Court notes that because Yballa has failed to submit the actual contract as evidence, his averments as to its contents violate the best evidence rule. *See* Fed.R.Evid. 1004.

**7.** As Yballa stated in his deposition:

A: ... So I went down there, I close the valve that supposed to be her job. It's not my job. It's her job. She get paid for standing like this to me. And she goes, 'Hurry up.'

Yballa Affid., at ¶¶ 8–9; Yballa Depo., at 29:25–30:21.

Problems began for Yballa when the First Engineer told him that Yballa had to work twelve hours a day every day and that if he were not willing to do so the First Engineer would make Yballa quit the ship. Yballa Affid., at ¶ 12.

Yballa also ran into problems arriving late for his shift. While his union contract requires only that he be on duty from 4:00 until 8:00, it is customary in the maritime industry for the relief watch to arrive 15 minutes early in order to get caught up to speed with what happened during the previous watch. Yballa Depo., at 61:4–62:18.

On one occasion, Yballa arrived 14 minutes before his shift officially was to begin and was warned about arriving late. On another occasion, Yballa overslept and showed up 30 minutes late. When he asked why no one had called to wake him up, which would be the usual practice, Yballa was told by the oiler he was replacing that the Second Engineer had ordered him not to wake Yballa up. Yballa was then given a written citation for being late. Yballa Affid., at ¶¶ 14–15.

Yballa also had difficulty with Third Engineer Christine Vanhulle. On one occasion, Vanhulle asked Yballa to help her open a big steam valve. Yballa, however, told her that his overtime work covered only chipping paint. When Vanhulle told the First Engineer that Yballa would not help her, the First Engineer said, "Ed, give Christine a hand, okay?" and Yballa said okay. Vanhulle then stood by as Yballa closed four valves, each taking 3–5 minutes.[7] Yballa Depo., at

That's not how you treat a person. You also help. You don't force the guy. You don't *harass* the guy. Hurry up, hurry up.

So when I finish that, I said okay, I had it. I went back. She goes there's another one, there's another one....

A: ... Now, if you are woman and you cannot handle the job, then you shouldn't be there in the engine department to rely anybody.

Q: She's a small woman?

A: She's not really that small, but kind of tiny, five two, five three. She was around almost 40 years old. But she was a third engineer.

Yballa Depo., at 68:10–69:19 (emphasis added).

67:19–69:10.[8]

On another occasion, on August 28, 1994, during Yballa's 4:00 p.m. to midnight shift, Vanhulle asked Yballa to make his rounds. When Yballa said that he had just made his rounds 20 minutes ago, Vanhulle started writing up his refusal in the log, noting that he was angry and cursing at her. Yballa, however, did not say anything to her except "okay, okay, don't write me down, I go make my round." When Yballa asked her why she was writing him up about his cursing and getting angry when he had not, Vanhulle would not answer him. Yballa Depo., at 47:2–50:7.[9]

One time while Yballa was on duty he reported seeing someone in the tunnel on the starboard side of the vessel, where no one was supposed to be, although the person was too far away for Yballa to recognize. Later, the Second Engineer went around the ship telling everyone that Yballa had reported seeing a "ghost," subjecting Yballa to ridicule from his crew members. Yballa Affid., at ¶¶ 20–22.

According to Yballa, he was being singled out and the officers were creating situations where they could reprimand him. The officers continually swore and directed profanity at Yballa and kept telling Yballa that he had to work overtime every day and that he should quit if he were not willing to do so. Yballa Affid., at ¶¶ 23–25.

At approximately 9:30 p.m. on August 28, 1994, Yballa called the Captain and told him that he was thinking of quitting because he felt sick and wanted to go see a doctor. At the time, Yballa was nervous and shaking and his chest felt tight. The Captain said okay. Yballa then called the Chief Engineer, Ed Robinson, sometime between 9:30 p.m. and 10:00 p.m., to advise him of his intentions. According to Yballa, Robinson said, "What the f—— you call me up here for? No, no, don't bother me, okay? Talk to me tomorrow. Bye;" and then he hung up.[10] Yballa Depo., at 50:8–54:8.

After getting off his watch at midnight, Yballa left the ship on his bike and rode to a telephone to call his wife to check on his family. When Yballa returned to the ship, he saw the second mate and talked to him about wanting to quit. The second mate then suggested that Yballa call Robinson again, but Yballa was hesitant to do so because Robinson was mad that Yballa had called him the first time. The second mate himself then called Robinson and woke him up at approximately 1:00 a.m. Yballa Depo., at 54:13–57:8. According to Yballa, the exchange went as follows:

A: ... 'Good morning, chief. Good morning. I have Edwin here, and I think he gives you—I think he calls you around 9:30. He was going to say something about being this.' Then he stop already. 'Oh, okay, okay, okay, okay, here's Edwin.' Like that.

Then I said hello. 'What the f—— you trying to tell? Why do you have to go over to the second mate, have me call over here? What the f—— you doing with me? I'll see

---

**8.** The Court notes that the far more abbreviated and conclusory account of this incident in Yballa's affidavit at ¶¶ 16–17 (stating, *e.g.*, "I never refused to do the work.") is inconsistent with his deposition testimony and essentially makes him out to be entirely blameless. The Court finds that this discrepancy sheds considerable doubt on the credibility of Yballa's affidavit. However, for purposes of this motion for partial summary judgment, the Court of course does not weigh credibility.

**9.** The Court notes that again Yballa's affidavit is inconsistent with his deposition testimony. According to Yballa's affidavit:

18. The Third Engineer, Christine Vanhulle, on one occasion asked me to make my rounds and informed me that she would then make the rounds after I was completed. I made the rounds and came back and she told me to do it again. I asked her what happened to the rotation that she said we were going to do, and she said "I'm ordering you to make the rounds." I then immediately made my rounds again.

19. When I came back ... Vanhulle[] said that she wrote me up for refusing to obey her orders. When I asked her why she did this, she put on her Walkman earphones over her ears and just smiled and bobbed her head at me.

Yballa Affid., at ¶¶ 18–19.

**10.** According to Robinson, he was asleep at the time. Robinson also states that he asked Yballa if it could wait until the morning and Yballa said it could. Robinson Affid., at ¶ 3.

you in the morning." And then he [Robinson] hung up.

Yballa Depo., at 57:4–14. Yballa then talked to the second mate some more until about 1:15 or 1:30 a.m., went to bed and woke up at 3:15 a.m. for his shift. Yballa Depo., at 57:19–58:1.

At 5:15 a.m., Robinson came into the control room where Yballa was sitting monitoring gauges. According to Yballa, this is what transpired:

> He [Robinson] came inside and he start pointing me, 'You mother f---er, what the f--- you trying to do? Why you doing this to me?' I said, 'Why? What did I do' 'Why you trying to ring me?' I said, 'I'm not bothering you, chief, I'm not bothering you. I'm just wanted something to tell you.'
>
> 'Well, if you want to f---ing quit, I want you to quit right f---ing now.' Exactly like that. And I was shock. He said, 'You want to quit? Okay. Get the f--- out of the door now.' That's what he wants me. I said okay. So I pick up my glove, my flashlight.
>
> Then he said, 'You walk out this f---ing door right now, I'm going to call the god d--- Coast Guard to pick you up over here and put you in the f---ing jail, get your god d--- license," you know, my endorsement. I said, 'Wait a minute. You told me to walk out the door. Now you told me you going to call me a Coast Guard on me.' 'Yeah don't you know I can say something about Coast Guard and you'll be big in trouble. Get the f--- in the chair.'
>
> And I went back in the chair, sit down and back again.

Yballa Depo., at 58:6–59:7.

At this point, Yballa experienced chest pains and difficulty breathing. The second engineer Robert Williamson contacted Robinson, who told Yballa to go to the mess hall. Yballa walked to the mess hall and sat down. The Chief Mate Walter Johnson arrived at the mess hall and he, Robinson and another seaman then proceeded to assist Yballa to the ship's hospital. On the way, Yballa collapsed and lost consciousness. Yballa Depo., at 59:6–60:20.

A Japanese ambulance team took Yballa to a hospital where he was diagnosed with a panic attack. Yballa was then flown back to Hawaii, where he started seeing a psychiatrist, Dr. Celina Guerrero. Dr. Guerrero pronounced Yballa not fit for duty for several months. Eventually, Yballa recovered, was found fit for duty and returned to the merchant marine.

### SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv.*, 809 F.2d at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment.

*British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics*, 818 F.2d at 1468 (emphasis in original) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31.

■ Finally, because causation under the Jones Act is treated liberally, "[c]ourts should exercise special care in considering summary judgment in Jones Act cases which require a very low evidentiary threshold for submission to a jury." *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770 (9th Cir.1981) (proximate cause, a mixed question of law and fact, treated liberally and generally a question of fact for the jury).

## DISCUSSION

### I. JONES ACT

The Jones Act, 46 App.U.S.C. § 688, provides:

(a) Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; . . . .

■ The reference to "statutes . . . modifying or extending the common-law right or remedy in cases of personal injury to railway employees" incorporates the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51, which provides for liability on the part of common carriers by railroad for "injury or death resulting in whole or in part from the *negligence* of [the employer]." *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770 (1981) (emphasis added).

■ "Because the Jones Act 'expressly provides for seamen the cause of action and consequently the entire judicially developed doctrine of liability granted to railroad workers by the FELA,' [citation omitted] we may appropriately look to FELA cases to test the sufficiency of the allegations and proof in [a] Jones Act claim." *Lies*, 641 F.2d at 770.

■ Finally, causation under the Jones Act is liberal:

[T]he test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.

*Lies*, 641 F.2d at 770–71.

Here, Yballa claims under the Jones Act that excessive, mandated overtime together with abuse and harassment by his superior officers and other crew members constituted (1) negligent infliction of emotional distress and (2) intentional infliction of emotional distress and caused his collapse on the morning of August 29, 1994.

Defendants do not dispute that Yballa is a "seaman" for purposes of the Jones Act. Defendants also do not dispute causation. Rather, Defendants contend that Yballa fails to raise a genuine issue of recovery under the Jones Act.

## A. *Negligent Infliction of Emotional Distress*

■ A claim for negligent infliction of emotional distress is cognizable under the Jones Act. *Chan v. Society Expeditions, Inc.,* 39 F.3d 1398, 1409 (9th Cir.1994) (citing *Consolidated Rail Corp. v. Gottshall (Gottshall),* 512 U.S. 532, ——, 114 S.Ct. 2396, 2407, 129 L.Ed.2d 427 (1994) (negligent infliction of emotional distress cognizable under FELA)).

What threshold standard must be met by plaintiffs bringing claims for negligent infliction of emotional distress under the Jones Act, however, has not yet been decided by the Ninth Circuit. *See Chan,* 39 F.3d at 1409 (declining to decide the issue because plaintiffs could not recover under either the "physical impact," the "zone of danger," or the "relative bystander" tests surveyed in *Gottshall*); *Gottshall,* 512 U.S. at ——, 114 S.Ct. at 2410 (choosing "zone of danger" test for claims of negligent infliction of emotional distress under FELA).

Under the most restrictive rule—the "physical injury or impact" rule—"the plaintiff may recover emotional distress damages only if he or she suffers an accompanying physical injury or contact." *Chan,* 39 F.3d at 1409. There is, however, some variation among states as to whether physical manifestations of emotional injury alone suffice to constitute "physical injury or impact" under the rule or whether plaintiff needs to have sustained an actual physical contact by the defendant.[11]

The Ninth Circuit appears to hold the view that under the "physical injury or impact"

rule, a plaintiff may not recover for emotional injury unless he also sustained an accompanying physical contact. *See Chan,* 39 F.3d at 1409 (citing *Plaisance v. Texaco, Inc.,* 937 F.2d 1004, 1009 (5th Cir.1991) ("The physical injury or impact rule permits recovery for emotional injury provided there is some physical contact."), *reh. en banc granted and aff'd,* 966 F.2d 166, 168 (5th Cir.1992) (statement of rule affirmed)).

The "physical injury or impact" rule, however formulated, is a minority rule. Moreover, among those jurisdictions still adhering to the rule, a majority appear to require physical contact to the plaintiff—mere physical manifestations of emotional injury alone are not sufficient. *See Gottshall,* 512 U.S. at ——, 114 S.Ct. at 2406 ("Most jurisdictions have abandoned this test, but at least five States continue to adhere to it;" citing *OB–GYN Assocs. of Albany v. Littleton,* 259 Ga. 663, 665 (1989) ("there must have been actual bodily contact with plaintiff as a result of defendant's conduct for a claim for emotional distress to lie"); *Shuamber v. Henderson,* 579 N.E.2d 452, 454 (Ind.1991) ("damages for mental distress or emotional trauma may be recovered only when the distress is accompanied by and results from a physical injury caused by an impact to the person seeking recovery"); *Deutsch v. Shein,* 597 S.W.2d 141, 146 (Ky.1980) ("it is necessary that the damages for mental distress sought to be recovered be related to, and the direct and natural result of, the physical contact or injury sustained"); *Hammond v. Central Lane Communications Ctr.,* 312 Or. 17, 23, 816 P.2d 593 (1991) (no liability for emotional injury absent accompanying actual or threatened physical harm); *but see Anderson v. Scheffler,* 242 Kan. 857, 860, 752 P.2d 667 (1988) (defining "physical impact" as actual physical injury *resulting from* the emotional distress, beyond generalized physical symptoms such as headaches and insomnia)).[12]

**11.** *See, supra,* note 2. The question would be whether the physical symptoms listed (*i.e.,* the physical manifestations of the underlying emotional injury) suffice to constitute "physical injury or impact" so as to permit recovery for negligent infliction of emotional distress absent any physical contact between the plaintiff and the defendant.

**12.** Kansas is thus the only state among those noted by the Supreme Court in *Gottshall* which allows recovery absent physical contact or threat of physical contact to the plaintiff, as long as the emotional distress results in physical manifestations.

The Court thus finds that in order to recover under the "physical injury or impact" rule, Yballa must have sustained a physical contact. Here, Yballa alleges no physical contact causing his collapse on August 29, 1994—merely verbal harassment and abuse by Robinson. Yballa Depo., at 58:6–59:7; *see also Barlette v. Consolidated Rail Corp.,* 1994 WL 721342, at **1, 3 (W.D.N.Y.1994) (plaintiff alleged that defendant "negligently retained and ... supervise[d] his supervisor, who subjected plaintiff to harassment and threatened termination of his employment, causing emotional distress with physical manifestations," but conceded "he [plaintiff] did not sustain any physical impact"). Yballa therefore cannot recover under this rule.

Under the next most restrictive rule, the "zone of danger" rule, "the plaintiff may recover even though there is no physical contact, so long as the plaintiff (1) witnesses peril or harm to another and (2) is also threatened with physical harm as a consequence of the defendant's negligence." *Chan v. Society Expeditions, Inc.,* 39 F.3d 1398, 1409 (9th Cir.1994) (citing *Nelsen v. Research Corp. of Univ. of Hawaii,* 805 F.Supp. 837, 850 (D.Haw.1992) (adopting rule)). This rule currently is followed in 14 jurisdictions. *See Gottshall,* 512 U.S. at ——–——, 114 S.Ct. at 2406, 2410 (ultimately adopting "zone of danger" rule for claims of negligent infliction of emotional distress under FELA).

Yballa however has alleged no facts suggesting that he was threatened with physical harm or within any "zone of danger." *See Consolidated Rail Corp. v. Gottshall,* 512 U.S. at ——, ——–——, ——, 114 S.Ct. 2396, 2402, 2411–12, 2416 (1994) (in *Carlisle* portion of case, plaintiff working for abusive, alcoholic supervisor suffered nervous breakdown after being forced to work 12–15 hour shifts for weeks at a time; court held "work-stress-related claim plainly does not fall within the common law's conception of the zone of danger"); *Barlette v. Consolidated Rail Corp.,* 1994 WL 721342, at **1, 3 (W.D.N.Y. 1994) (plaintiff's allegations that supervisor "subjected [him] to harassment and threatened termination of his employment, causing emotional distress with physical manifestations" failed to allege he was within any zone of danger); *Capriotti v. Consolidated Rail Corp.,* 878 F.Supp. 429, 433 (N.D.N.Y.1995) (plaintiff's allegations that employer negligently instructed him " 'to work long hours and under stressful conditions' " thereby aggravating his heart condition failed to allege he was within any zone of danger). Yballa therefore cannot recover under this rule either.

Finally, under the "bystander proximity" or "relative bystander" rule, adopted by nearly half the states, a plaintiff outside the zone of danger may recover if he "(1) is physically near the scene of the accident; (2) personally observes the accident; and (3) is closely related to the victim." *Chan,* 39 F.3d at 1409. This rule clearly is inapplicable to Yballa's situation.[13]

Here, as in *Chan,* the Court finds that Yballa cannot recover as a matter of law under the "physical impact," the "zone of danger," or the "relative bystander" rules. Yballa therefore fails to raise a genuine issue of recovery for negligent infliction of emotional distress.

The Court holds that it is bound by *Gottshall* and thus adopts the "zone of danger" rule for claims of negligent infliction of emotional distress under the Jones Act. *See Gottshall,* 512 U.S. at ——, 114 S.Ct. at 2410 ("[T]he zone of danger test best reconciles the concerns of the common law with the principles underlying our FELA jurisprudence."); *Nelsen v. Research Corp. of Univ. of Hawaii,* 805 F.Supp. 837, 850 (D.Haw. 1992) ("plaintiff was ... squarely within the zone of danger"). Under this rule, Yballa fails to raise a genuine issue that he was within any "zone of danger."

13. In his opposition, Yballa also analyzes general Hawaii law on negligent infliction of emotional distress and concludes that Hawaii fits into none of the three rules. Plaintiff's Opposition, at 5–6 (citing *Rodrigues v. State,* 52 Haw. 156, 173, 472 P.2d 509 (1970) ("We hold that serious mental distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.")). The Court finds however that the "zone of danger" rule precludes recovery in this admiralty setting (as do the "physical injury or impact" and "bystander proximity" or "relative bystander" rules).

In any event, Yballa fails to raise a genuine issue of recovery for his claim of negligent infliction of emotional distress under any of the three rules under the Jones Act.

## B. *Intentional Infliction of Emotional Distress*

■ Yballa claims also that the harassment and abuse he suffered constituted intentional infliction of emotional distress.[14]

Preliminarily, the question arises whether a claim of intentional infliction of emotional distress is even cognizable under the Jones Act.[15] *Compare Adkins v. Seaboard Sys. R.R.*, 821 F.2d 340, 341 (6th Cir.1987) (not cognizable under FELA) *and Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807, 813, 815 (7th Cir.1985) (same; FELA contemplates only claims of "traditional 'physical' torts, such as assault, battery, and negligent infliction of personal injury") *with Teague v. Nat'l R.R. Passenger Corp.*, 708 F.Supp. 1344, 1351 (D.Mass.1989) (cognizable under FELA) *and Kraus v. Consolidated Rail Corp.*, 723 F.Supp. 1073, 1088 (E.D.Penn.1989) (same; citing *Teague* ); *see also Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, ——, 114 S.Ct. 2396, 2403, 129 L.Ed.2d 427 n. 2 (1994) (declining to decide issue; "[w]e are not concerned here with the separate tort of intentional infliction of emotional distress").

The rule in the Ninth Circuit is unclear. Prior to *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398 (9th Cir.1994), it appeared that intentional infliction of emotional distress was *not* cognizable under FELA and, by analogy, the Jones Act. *See Taylor v. Burlington Northern R.R. Co.*, 787 F.2d 1309, 1314–15 (9th Cir.1986) (plaintiff alleged harassment by railroad foreman caused schizophrenia; court characterized "criticizing and disciplining" as *assault*, citing *Lancaster* [which held FELA covered only the traditional "physical" torts] with approval); *Buell v. Atchison, Topeka and Santa Fe Ry. Co.*, 771 F.2d 1320, 1321, 1324 (9th Cir.1985) (plaintiff alleged emotional breakdown caused by harassment, threats and intimidation by immediate supervisor and fellow employees but court held only that "where an employee has suffered an injury attributable to employer *negligence*, the injury is compensable under the FELA" [emphasis added] ), *aff'd in part, vacated in part, and remanded*, 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987).

However, in *Chan*, the Ninth Circuit, upon considering the Supreme Court's opinion in *Gottshall*, seemed to hold *generally* that "claims for emotional distress are cognizable under admiralty law," even though *Chan* dealt only with *negligent* infliction of emotional distress. *Chan*, 39 F.3d at 1409 (finding persuasive the observation in *Gottshall*, 512 U.S. at ——, 114 S.Ct. at 2407, that negligent infliction of emotional distress "is nearly universally recognized among the States today"); *see also Atchison, Topeka*

---

**14.** The record is unclear whether Yballa claims intentional infliction of emotional distress as a cause of action under the Jones Act separate and independent from his claim of negligent infliction of emotional distress. At the hearing, counsel for Yballa argued that Sea–Land was negligent in allowing the intentional infliction of emotional distress to continue—which essentially incorporates Yballa's claim for intentional infliction into his claim for negligent infliction. Nevertheless, the Court also will consider Yballa's claim of intentional infliction of emotional distress as a separate and independent claim under the Jones Act.

**15.** "[I]n the spirit of broad construction, the FELA has been construed to cover some intentional torts even though its text only mentions negligence." *Atchison, Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 n. 8, 107 S.Ct. 1410, 1414 n. 8, 94 L.Ed.2d 563 (1987).

In addition, "courts have found that two theories of liability exist in FELA cases involving intentional assaults . . .: respondeat superior and direct negligence. [citation omitted] Under the theory of respondeat superior, an employer is liable for the intentional assaults committed by its employee in furtherance of the employer's business. [citations omitted] Under the theory of direct negligence, an employer is liable if it fails to prevent reasonably foreseeable danger to an employee from intentional or criminal misconduct." *Taylor v. Burlington Northern R.R. Co.*, 787 F.2d 1309, 1314–15 (9th Cir.1986).

Here, any theory of direct negligence is subsumed within Yballa's claim of negligent infliction of emotional distress, discussed above. With respect to the theory of respondeat superior, the Court will assume, for purposes of this motion, that all of the actions of Sea–Land's employees were in furtherance of Sea–Land's business.

*and Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 568, 107 S.Ct. 1410, 1417, 94 L.Ed.2d 563 (1987) (noting that "most States now recognize a tort of intentional infliction of emotional distress . . . [and] many . . . have now recognized a tort of negligent infliction of emotional distress" [footnote omitted] ).

The Court however need not decide the issue here. In *Atchison, Topeka and Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987), plaintiff filed a FELA complaint alleging that his employer railroad had condoned his harassment by fellow employees, causing him to suffer an emotional breakdown. The Supreme Court declined to decide whether purely emotional injury is actionable under the FELA.[16] While appearing to treat plaintiff's claim as one for negligent infliction of emotional distress, however, the Supreme Court rebutted defendant's "floodgates" argument by invoking language associated with *intentional* infliction of emotional distress. *Id.* at 567 n. 13, 107 S.Ct. at 1416 n. 13 (court not convinced that significant percentage of employees bringing claims of emotional injury would meet prerequisites of having suffered "severe emotional injury" as the result of "unconscionable abuse" or "outrageous conduct;" citing

*Restatement (Second) of Torts* § 46 and comment d. (1965)).

Subsequent to *Buell,* courts, rather than deciding flat out whether emotional injury was actionable under FELA, instead "avoided the general question by focusing on the prerequisites to recovery set forth in *Buell*— 'unconscionable abuse' and 'severe emotional injury.' " *Visconti v. Consolidated Rail Corp.,* 801 F.Supp. 1200, 1209 (S.D.N.Y.1992) (surveying courts in various circuits).

Here, therefore, the Court need not decide whether intentional infliction of emotional distress is actionable under the Jones Act because it finds that Yballa, even assuming he suffered "severe emotional injury," was not subject to the "unconscionable abuse" or "extreme and outrageous conduct" necessary to support a claim for intentional infliction of emotional distress.[17]

Yballa claims the following instances of abuse: (1) the First Engineer told Yballa that he had to work 12 hours a day every day and said he would make Yballa quit the ship if Yballa did not (Yballa Affid., at ¶ 12);[18] (2) Yballa once was warned about arriving late when he arrived 14 minutes before the official start of his shift (Yballa Affid., at ¶ 14);[19]

---

16. As discussed above, the Court in *Gottshall* later did decide the issue, but only with respect to *negligent* infliction of emotional distress.

17. Section 46(1) and comment d thereto of the *Restatement (Second) of Torts* states:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
d. Extreme and outrageous conduct. . . . It [is] not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to *go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. . . .*
The liability *clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.* The rough

edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of *rough language, and to occasional acts that are definitely inconsiderate and unkind.*
*Id.* (emphasis added).

18. Yballa, however, states in his affidavit:

33. I did not have the physical problem that I had because of too much work. I had the breakdown because of the dangerous conditions created by the harassment and mental abuse to which I was subjected by my superior officers.
34. In jobs that I have had since I left SEA-LAND I have regularly worked 12 hours a day on vessels. It was not too much work that caused my problem. It was the abusive treatment that I was given because I fell out of favor with the ship's officers.
35. My physical illness was not due to overwork, it was because of the abusive treatment I was given which was not really part of my job.

19. Yballa concedes however that it is customary in the maritime industry for the relief shift to arrive 15 minutes early. Yballa Depo., at 61:4–62:18.

(3) Yballa once deliberately was not given a wake up call when he overslept by 30 minutes (Yballa Affid., at ¶ 15); (4) Yballa once was forced to help Third Engineer Christine Vanhulle open four steam valves, even though that was not part of his overtime job description (Yballa Depo., at ¶ 67:19–69:10); (5) Yballa once was told by Vanhulle to make his rounds even though he had just made his rounds 20 minutes earlier and when he refused was written up falsely for cursing and getting angry (Yballa Depo., at 47:2–50:7); (6) Yballa once reported seeing someone in the starboard tunnel and then was ridiculed by other crew members for having seen a "ghost" (Yballa Affid., at ¶¶ 20–22); (7) Chief Engineer Ed Robinson swore at Yballa over the phone on two occasions when Yballa called and woke him up the night of August 28, 1994 and early the next morning (Yballa Depo., at 50:8–54:8); and (8) Robinson came into the control room the morning of August 29, 1994 and verbally abused Yballa, alternately telling Yballa to get out the door and sit back down in the chair and threatening to call the Coast Guard on Yballa (Yballa Depo., at 58:6–59:7).[20]

Yballa does not raise a genuine issue of "extreme and outrageous conduct" or "unconscionable abuse." *See Visconti v. Consolidated Rail Corp.,* 801 F.Supp. 1200, 1201–07, 1213 (S.D.N.Y.1992) (plaintiff's allegations of 54 separate incidents of harassment and abuse—including harassment and belligerence by her managers; fabrications of work rule violations and insubordination; false charges of reproduction and removal of confidential documents; laughter and humiliation in front of coworkers; and obscene language and phone calls—failed to constitute "the type of unconscionable abuse or outrageous behavior for which tort law provides a remedy"); *see also id.* at 1209–10 (citing *Elliott v. Norfolk & Western Ry. Co.,* 910 F.2d 1224, 1230 (4th Cir.1990) (plaintiff's claim of emotional distress as a result of (1) accusations that she had prepared erroneous operations reports; (2) her assignment to tasks that required lifting despite a back ailment; and (3) an inquiry from a supervisor questioning whether she properly had performed a certain task "never rose to the level of being outrageous or amounting to unconscionable abuse"); *Cohen v. Metro–North Commuter R.R. Co.,* 1991 WL 4699, at **3 (S.D.N.Y. 1991) (plaintiff's allegations that managers falsely accused him of work rule violations and singled him out for discipline and that a supervisor instigated an altercation by ordering him off company property "failed to allege the outrageous conduct necessary to support a claim for infliction of emotional distress")).

> "All men are to some degree irascible; every workman is apt to be angry when a fellow complains of his work to their common superior; and some will harbor their resentment and provoke a quarrel over it even after the lapse of several hours. *Sailors lead a rough life* and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the 'disposition' of 'the ordinary men in the calling.' "

*Boudoin v. Lykes Bros. Steamship Co.,* 348 U.S. 336, 338–39, 75 S.Ct. 382, 99 L.Ed. 354 (1955) (emphasis added) (quoting *Jones v. Lykes Bros. Steamship Co.,* 204 F.2d 815, 817 (2d Cir.1953)). The Court finds that Yballa's allegations of mistreatment on board the Sea–Land Producer, even assuming they are true, fail to rise to the level necessary to raise a genuine issue of intentional infliction of emotional distress.

## II. *UNSEAWORTHINESS*

General maritime law imposes an absolute duty upon a shipowner to provide a vessel that is seaworthy. [citation omitted] This warranty of seaworthiness does not mean that the vessel is guaranteed to weather all storms or that it is accident-proof. It does

---

**20.** Yballa's affidavit also contains various conclusory averments to the effect that the ship's officers (1) continually swore at him, pressured him to work overtime, and told him he should quit if he would not and (2) "created" situations where they could reprimand him. Yballa however cannot defeat a motion for summary judgment thusly. *See Netto v. Amtrak,* 863 F.2d 1210, 1216 (5th Cir.1989) (" '[I]t is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint....' ").

mean that the vessel, together with its gear and complement of personnel, are reasonably fit to complete the intended voyage. [citation omitted] ...

Liability resulting from a failure to provide a seaworthy ship does not depend upon the negligence of the owner. The duty is absolute and thus creates a variety of liability without fault. [citations omitted] It is completely independent of any duty to exercise reasonable care under the Jones Act.

*Reinhart v. United States,* 457 F.2d 151, 152 (9th Cir.1972).

■ Yballa bases his claim of unseaworthiness on two contentions: (1) the ship was understaffed—requiring the crew to work an "inhumane level of overtime hours"—and therefore unseaworthy and (2) the crew members aboard the ship, because they continually harassed and abused Yballa, were not "reasonably fit," thereby rendering the ship unseaworthy. Plaintiff's Opposition, at 10–12.

Yballa's first contention is belied by his own affidavit. *See* Yballa Affid., at ¶¶ 33–35 and *supra* note 18 ("I did not have the physical problem that I had because of too much work.... In jobs that I have had since I left SEA–LAND I have regularly worked 12 hours a day on vessels. It was not too much work that caused my problem.... My physical illness was not due to overwork...."). Thus, while an undermanned ship may constitute an unseaworthy ship under some circumstances,[21] here, even assuming for the moment that the Sea–Land Producer was undermanned, Yballa admits that any such undermanning did not cause his injuries and therefore causation is absent as a matter of law.

In support of his second contention, Yballa cites *The Rolph,* 299 F. 52, 53 (9th Cir.1924) (brutal, inhuman, violent and cruel mate "day after day, sometimes several times a day, struck and beat [plaintiff] and other seamen, sometimes with his fists and sometimes with belaying pins; ... at one time he struck [plaintiff] across the eyes with a knotted rope ... [and] while his eyes were injured the mate, who was a large, powerful man, kicked [plaintiff] and compelled him to work; ... when [plaintiff] was unable to obey orders by reason of his injuries the mate tied him to the bilge pump."), *Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955) (drunk mate struck plaintiff with bottle of brandy, causing severe injuries, returned with a large knife intending to use it on him, and later created a disturbance, including threatening plaintiff, outside his hospital room), and *Stechcon v. United States,* 439 F.2d 792 (9th Cir.1971) (triable issue where mate, 75 pounds heavier than plaintiff, unprovoked, attacked plaintiff, knocked him to ground, and continued pounding on him until pulled off).

Yballa cites no cases, and the Court can find none, raising a triable issue of unseaworthiness on the grounds of unfitness of the crew members absent some sort of physical assault on the plaintiff. *See, e.g., Smith v. American Mail Line, Ltd.,* 525 F.2d 1148, 1149 (9th Cir.1975) (steward brutally murdered by passenger with fire axe; had murderer been crew member, recovery possible on ground of unseaworthiness).

Moreover, even assuming physical assault is not a prerequisite to recovery for unseaworthiness on the grounds of unfitness of the crew members, the Court finds that Yballa's alleged mistreatment aboard the Sea–Land Producer fails to raise a genuine issue of unseaworthiness.

### CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for partial summary judgment.

The Court GRANTS Defendants' motion as to defendant S.S. Sea–Land Reliance.

---

**21.** *See, e.g., Waldron v. Moore–McCormack Lines, Inc.,* 386 U.S. 724, 728–29, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967) (jury question whether assignment of two men to do work of three or four in hauling heavy mooring line along deck during docking made vessel unseaworthy); *American President Lines, Ltd. v. Welch,* 377 F.2d 501, 504 (1967) (fact question whether repairing lube pump was two-man job and dangerous for one man alone, thereby rendering vessel unseaworthy).

S.S. Sea–Land Reliance is hereby DIS-MISSED as a defendant from the action.

The Court GRANTS Defendants' motion as to Plaintiff's claims under the Jones Act and of unseaworthiness under general maritime law.

The Court DENIES Defendants' motion as to Plaintiff's claim of cure.

IT IS SO ORDERED.